IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 13, 2013

**ANTHONY DEAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 98-14047      James C. Beasley, Jr., Judge**

**No. W2012-02354-CCA-R3-CO - Filed December 20, 2013**

The petitioner, Anthony Dean, appeals the summary dismissal of his petition for writ of error coram nobis. After review, we affirm the judgment of the trial court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Anthony Dean, Whiteville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Kate Edmond, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On March 28, 2000, the petitioner was convicted of aggravated rape and sentenced as a violent offender to forty years in the Department of Correction due to his rape of an eighty-nine-year-old woman. This court summarized the underlying facts of the case on direct appeal as follows:

> The victim, R.G.,[1] who was 92 years old at the time of trial, testified that as of the day of the crime, August 1, 1998, she was 89 years old, turning 90 about two weeks later. She said that she was awakened at about 4 a.m.

---

[1] Because of the nature of the crime, we will identify the victim by her initials.

after a man had come into her apartment through her balcony glass door. As she tried to rise from the bed, the intruder grabbed her throat and pushed her back. He tried to penetrate both her vagina and her anus, but was unsuccessful at first. However, on a second attempt, he did penetrate her vagina. As a result of the attack, the victim sustained tears and a laceration in her vagina and still had stiffness in her neck and pain in both her arm and shoulder at the time of the trial. Also, because of the position she was forced into during the rape, she had to begin using a cane or a walker, and was still doing so at the time of trial.

She testified that she recognized the intruder because he had been in her apartment the day before the attack. She had noticed him near her apartment door, and he said that he lived in a nearby apartment and had not seen one like hers. She invited him in and, during their conversation, said that she needed to have her hair cut. He told her that he was a barber and could cut her hair. He left but returned later that day, coming into her apartment without an invitation and telling the victim that he had come to cut her hair. She told him that she did not want her hair to be cut then, and he left again. While he was in her apartment, she told him that she kept her balcony door open during the night while she was sleeping. She said that, during one of her conversations with the [petitioner] prior to the rape, he told her that he lived in apartment 1011 with another person. Subsequently, when first interviewed, the [petitioner] was in apartment 1011. The victim lived in apartment 1001.

During direct examination, the victim testified that she had picked out a photograph of the man who attacked her, first saying, "That's the one I picked out and signed my name under it," and then explaining that she "[m]ight not have been positive but that's the one I picked out." When asked, during her trial testimony, whether the man who raped her was in the courtroom, she identified the [petitioner], saying, "He's sitting over there. I saw him when he came in." She also identified the [petitioner]'s black and white tennis shoes as being like those worn by her attacker. During cross-examination, the victim was asked if, apparently during the preliminary hearing, she had identified another man in the General Sessions courtroom as her attacker and appeared to deny that she had done so. However, Judge Tim Dwyer, of the Shelby County General Sessions Criminal Court, testifying as a defense witness, recalled that the victim, in her wheelchair, had testified during the preliminary hearing and had identified another man as her attacker.

Michael Carl Davis, who was the janitor and also a resident of the same

apartment building where the victim lived, testified that he lived in apartment 1101, which was directly above the victim's apartment. He said that on the morning the victim was attacked, he was awakened just before 4 a.m. when a man, whom he identified as the [petitioner], came into his apartment. When Davis asked the [petitioner] why he was there, the [petitioner] replied, "I was just hollering at you." Davis recognized the [petitioner] as having been in the building on previous occasions trying to get residents to let him cut their hair. He said that he was shown a series of photographs either later that day or the following day, and identified the photograph of the [petitioner] as the man who had earlier asked to cut his hair and who had entered his apartment the morning of the rape. Additionally, he identified the [petitioner] in the courtroom as the same man.

Sandra K. Anderson, a sexual assault nurse examiner with the Memphis Sexual Assault Resource Center ("MSARC"), testified that she had met with the victim at the hospital on the day of the rape and collected evidence consisting of vaginal and oral swabs, a blood standard for DNA analysis, and pubic hairs. She described the injuries, which she observed to the victim, and said that she had placed the rape kit in a locked storage area of the MSARC.

Sergeant Donald Ray Dickerson, a sex crimes investigator with the Memphis Police Department, testified that he had met with the victim on the day of the rape at the Regional Medical Center in Memphis. After she gave him a description of the man who had raped her, he then began talking with residents of the apartment building to see if any of them recognized the man from the description. He was told that a man meeting the description "frequent[ed]" an apartment which was on the same floor and a few units away from that of the victim. After several visits with no response to apartment 1011, the door was opened by a man, whom Dickerson later identified as the [petitioner]. Dickerson observed that the [petitioner] matched the description given by the victim of her attacker. During this visit to the apartment, Dickerson saw a pair of tennis shoes matching the victim's description of the shoes worn by her attacker. The [petitioner] said that his name was "Tony Adams" and gave several different dates of birth. He also gave Dickerson his mother's name and telephone number but, after talking with her, Dickerson determined that the man with whom he had spoken was not Tony Adams but was the [petitioner], Anthony Harold Dean. With this information, Dickerson obtained a photograph of the [petitioner] and showed it, along with photographs of others, to Michael Carl Davis. From this group, Davis identified that of the [petitioner] as being the man who had come into his

-3-

apartment on the morning of the rape. He also showed the photospread to the victim, and she identified and signed her name to a photograph of the [petitioner].

Dickerson then distributed a photograph of the [petitioner] to other police officers because he wanted to question the [petitioner]. He was notified on August 5, 1998, that the [petitioner] had been taken into custody. Taken from the [petitioner] at that time were the tennis shoes he was wearing and an entry card for the apartment building. Dickerson interviewed the [petitioner], who denied the rape or that he had been in the building when it occurred. The [petitioner] remained in jail, and, on August 10, Dickerson obtained and served on the [petitioner] a search warrant to take hair and blood samples, after the [petitioner] had refused to voluntarily provide them. When the search warrant was served on the [petitioner], he told Dickerson that he wanted to talk about the case.

In the interview room, the [petitioner] again was advised of his rights and gave a statement, which was read to the jury, admitting that he had entered the victim's apartment and raped her. After the statement was completed, blood and hair samples were obtained from the [petitioner] by an employee of the MSARC, who also photographed the [petitioner] and took his thumbprint.

Dickerson said that, at the preliminary hearing, the victim had identified another man as the person who had raped her. In redirect examination, Dickerson said that the victim was in a wheelchair during the preliminary hearing and that the [petitioner] was standing in a group of nine or ten black males, all dressed in jail-issued clothing, when the victim identified another as her assailant. He described the person whom she identified as having "a lot of similarities" with the [petitioner], meaning they "had the approximate height, same height, same stature, build and somewhat complexion-wise" and the same "hairstyle."

Sally DiScenza, a forensic nurse examiner with the MSARC, testified as to the records of the Center, consisting of samples taken from the victim following the rape and blood drawn from the [petitioner] for DNA analysis. This evidence was provided to the Tennessee Bureau of Investigation ("TBI") for examination and comparison.

Steven M. Wiechman, who at the time of the trial was employed by the Ohio Bureau of Criminal Identification and Investigation and a former

-4-

employee of the TBI Crime Laboratory in Jackson, Tennessee, testified that while he was with the TBI, as a special agent forensic scientist, he had received and performed tests on the rape kit in this matter. He determined that spermatozoa and semen were present on the vaginal swabs and slide taken from the victim. He then sent the vaginal swabs and blood standard from the victim, as well as a second kit which contained a blood standard from the [petitioner], to the TBI Laboratory in Nashville for DNA analysis.

Raymond DePriest, a special agent forensic scientist with the TBI in Nashville, testified that he received and performed tests on the swabs from the victim and the blood sample from the [petitioner]. Utilizing DNA profiling, he determined that the sperm fraction of both the vaginal and vulvar swabs from the victim matched the blood sample taken from the [petitioner]. He testified that the "statistical probability of someone else being a contributor [of the sperm samples] is 1 in 6 billion." During cross-examination, he explained that this estimate actually was conservative and that the probability that a person other than the [petitioner] had contributed the sperm recovered from the victim was one in forty-one quadrillion. Following the testimony of Agent DePriest, the State rested its case.

Kenneth Robinson, testifying as a defense witness, said that he was the building engineer for the apartment building in which the victim lived. He said that the apartments, including that in which the victim resided, had balconies approximately three feet wide which extended to the stairwells. A photograph identified by the victim of the building showed that a horizontal, concrete ledge ran alongside each of the balconies and extended beyond them. Robinson testified that by standing on this ledge and holding onto balcony railings, a person could go from balcony to balcony.

State v. Dean, 76 S.W.3d 352, 357-60 (Tenn. Crim. App. 2001).

On direct appeal, the petitioner alleged, among other things, that his confession and DNA evidence resulting from the search warrant should have been suppressed because he was not timely taken before a magistrate. Id. at 360. This court concluded that the petitioner's confession should not have been introduced at trial but determined that the error did not affect the outcome of the trial in light of the remaining evidence introduced against the petitioner. Id. at 364, 371. The Tennessee Supreme Court denied his application for permission to appeal.

In various petitions filed in 2002 and 2003, the petitioner sought post-conviction

relief, in which he argued that his due process rights were violated because he was not taken timely before a magistrate and, therefore, the DNA samples taken from him during his unlawful incarceration should have been suppressed. He also raised numerous claims of ineffective assistance of counsel. Anthony H. Dean v. State, No. W2005-02319-CCA-R3-PC, 2006 WL 3613598, at *4 (Tenn. Crim. App. Dec. 7, 2006), perm. app. denied (Tenn. Apr. 16, 2007). On appeal of the denial of post-conviction relief, this court concluded that the petitioner's allegations regarding his not being taken before a magistrate and the DNA evidence were disposed of on direct appeal and would not be re-litigated simply by phrasing the issue in different terms. Id. at *5-6. This court also concluded that the petitioner was not entitled to relief on any of his allegations of ineffective assistance of counsel. Id. at *6-18.

In 2006, the petitioner filed a petition for writ of habeas corpus in the Hardeman County Chancery Court, arguing that the arrest warrant and indictment which resulted in his incarceration were defective. Anthony Dean v. Glen Turner, Warden, No. W2007-00744-COA-R3-CV, 2007 WL 4404112, at *1 (Tenn. Ct. App. Dec. 18, 2007). The State filed a motion to dismiss, asserting that the substance of the claim had been previously determined and that the trial court in which the petitioner was convicted had subject matter jurisdiction to adjudicate the case under a valid indictment. The chancery court granted the State's motion to dismiss the habeas corpus petition. Id. The Tennessee Court of Appeals determined that the chancery court lacked subject matter jurisdiction to hear the petitioner's petition for a writ of habeas corpus and vacated the judgment of the chancery court. Id. at *2.

In 2008, the petitioner filed a petition for writ of habeas corpus in the Hardeman County Circuit Court, arguing that his conviction was void due to the fact that his initial detention was unconstitutional. Anthony H. Dean v. Joe Easterling, Warden, No. W2008-01302-CCA-R3-PC, 2009 WL 1530183, at *1 (Tenn. Crim. App. May 22, 2009), perm. app. denied (Tenn. Oct. 19, 2009). On appeal of the habeas court's dismissal of the petitioner's petition, this court affirmed and held, "In the present case, the Grand Jury returned a valid indictment against the [p]etitioner after his arrest and detention. The trial court had jurisdiction to enter the judgment against the [p]etitioner." Id. at *3.

On September 25, 2012, the petitioner filed an untimely *pro se* petition for writ of error coram nobis. In his petition, he asserted that he received information pursuant to a public records request that a "True Bill indictment was not returned against [him] in the December term of 1998" of the grand jury and that the indictment was not "returned into open court by the [g]rand jury with the proper endorsement of a True Bill during the November or December term of 1998." He claimed that such evidence demonstrated that the State suppressed it in violation of Brady v. Maryland, 373 U.S. 83 (1963), and also that

-6-

counsel was ineffective for failing to inform him that his conviction was void because an indictment had not been returned into open court. The coram nobis court dismissed the petition on grounds that it was untimely filed and that the petitioner asserted no basis for tolling the statute of limitations. The court also found that the petitioner did not raise any issue upon which relief could be granted.

## ANALYSIS

The petitioner argues that the trial court erred in dismissing his petition for writ of error coram nobis. He asserts that the court erroneously found that he presented no issues upon which relief could be granted, erroneously found that he made no allegations that would toll the one-year statute of limitations, and abused its discretion in dismissing his petition without a hearing due to judicial bias.

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

The statute of limitations for filing a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. See Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 667. A judgment becomes final, for purposes of coram nobis relief, thirty days after the entry of the judgment in the trial court if no post-trial motion is

filed, or upon entry of an order disposing of a timely filed post-trial motion. <u>Mixon</u>, 983 S.W.2d at 670-71. The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. <u>Sands v. State</u>, 903 S.W.2d 297, 299 (Tenn. 1995). However, due process considerations may toll the limitations period. <u>Workman v. State</u>, 41 S.W.3d 100, 103 (Tenn. 2001). To determine whether due process tolling applies, courts should examine: (1) when the limitations period would normally have begun to run; (2) whether the grounds for relief arose after the limitations period normally would have commenced; and (3) if the grounds are later-arising, would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. <u>Sands</u>, 903 S.W.2d at 301.

There is no dispute that the petitioner filed his petition outside the one-year statute of limitations – more than eleven years later to be exact. However, the record does not reflect a response by the State raising the bar of the statute of limitations as an affirmative defense. Therefore, we will address the petitioner's claims. On appeal, as he did in his petition, the petitioner argues that he recently discovered evidence pursuant to a public records request that the State "failed to comply with mandatory statutory procedures concerning proper presentation and filing of his indictment [meaning] that the charging instrument had no legal effect." He asserts that such evidence shows that the State suppressed it in violation of <u>Brady v. Maryland</u> and that his counsel was ineffective for failing to so inform him.

We note that the petitioner has previously raised challenges to counsel's effectiveness and the validity of the indictment. Moreover, even if the petitioner's allegations are true, he cannot show and does not contend that the "newly discovered evidence," *inter alia*, the trial court's minute entries, may have resulted in a different judgment had it been presented at the trial. The petitioner's allegations do not constitute a cognizable claim for error coram nobis relief. Accordingly, we affirm the dismissal of the petition for writ of error coram nobis.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court dismissing the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE